# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION NO. |
| SAMUEL SOLORIO HERRERA, | 1:21-CR-00272-LMM-JEM-1 |
| Defendant. | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

Pending before the Court is Defendant's motion to suppress statements. (Doc. 41). For the reasons discussed below, the Court **RECOMMENDS** that Defendant's motion be **DENIED**.

### I.    PROCEDURAL HISTORY

A federal grand jury sitting in the Northern District of Georgia returned a four-count indictment against Defendant on July 20, 2021, that charged him with conspiracy to possess with intent to distribute methamphetamine (count 1), and three separate dates of substantive possession with intent to distribute methamphetamine (counts 2–4). (Doc. 1). Defendant was arrested in the District of Oregon on July 29, 2021. (Dkt. at 07/29/2021). He filed the pending motion to suppress statements on February 3, 2022, in which he asserted that statements he made to law enforcement on the date of his arrest were obtained in violation

of *Miranda*.[1] (Doc. 41). The Court held an evidentiary hearing on Defendant's motion on November 9, 2022. (Docs. 55; 59). Having now received the parties' post-hearing briefs, the matter is ripe for review. (Docs. 62; 63; 64).

## II.   STATEMENT OF FACTS

On July 29, 2021, an Oregon State Police SWAT team assisted the Drug Enforcement Administration (DEA) with executing a search warrant at a large, multi-acre, agricultural property in Oregon that housed an illegal marijuana grow operation. (Doc. 59 at 5-12, 15-17, 20, 28-29).[2] The property included multiple green houses that contained marijuana, and a makeshift, tarp-covered, structure used as a living quarters for eight to twelve individuals, as well as at least one other tent that housed individuals. (*Id.* at 5-12, 15-17, 24). In addition to executing the search warrant on that date, law enforcement planned to execute state arrest warrants, and a federal arrest warrant for Defendant, who agents believed would be present at the property. (*Id.* at 5, 17, 28-29).

Trooper Kyle Winship, a member of the participating SWAT team, testified that the property's border on one side was a river, and at about 2:00 a.m. on July 29th, the SWAT team approached the property by crossing the river in a shallow area. (*Id.* at 5-6, 16). Winship testified that there were six to ten members of the SWAT team; they were wearing camouflage uniforms,

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966)(holding that certain specific warnings must be given in order for a defendant's statement(s) made during custodial interrogation to be admitted into evidence).

[2] Transcript cites refer to the court reporter's page numbers, not to the Court's ECF page numbering.

ballistic vests, and helmets, with patches on the uniforms that indicated they were state police; and that all of the team members carried either a pistol or an AR-15 rifle. (*Id.* at 6-7, 11). According to Winship, as they approached the encampment, some of the individuals in the separate tent had gotten into a vehicle, and the vehicle's headlights exposed the team members, so at that point, they expedited their entry, turned on their lights, and announced that they were the police. (*Id.* at 7-8, 12). The team members had their weapons drawn for officer safety, and in both English and Spanish, they instructed all of the individuals to raise their hands and to stop or not move. (*Id.* at 11-13, 17-19).

Winship testified that Defendant was one of the individuals within the living quarters that Winship detained and handcuffed. (*Id.* at 11, 14). According to Winship, he holstered his pistol at the point that he began detaining individuals, as did the other team members with pistols. (*Id.* at 19, 24). The team members with rifles also secured them, though they could not be "holstered." (*Id.* at 19). Winship testified that he did not use any physical force against Defendant, and no physical force was used by anyone else against Defendant, nor was any physical force used against any other individuals in front of Defendant. (*Id.* at 13-14). Winship also testified that he did not threaten Defendant or promise him anything, nor did anyone else make any threats or promises while Winship was in Defendant's presence. (*Id.* at 14). Winship asked for Defendant's name, and Defendant responded that it was Samuel Solorio. (*Id.* at 11). Winship then showed Defendant a surveillance photograph, and he asked if Defendant was the individual in the photo. (*Id.* at 12). Defendant responded that it was him. (*Id.*). Upon locating a wallet, Winship also asked

3

Defendant if his identification was in the wallet, and he located Defendant's photo identification. (*Id.* at 24-25). Winship testified that Defendant said something to Winship in Spanish, but Winship, who knows only a "very small amount" of Spanish, did not understand what Defendant said. (*Id.* at 13). Winship did not give *Miranda* warnings at that time because his role was to "just detain," and the rest was "up to the investigators." (*Id.*).

Winship wore a body camera, and the footage captured by his body camera, which includes his entire 10-minute interaction with Defendant, was admitted into evidence. (*Id.* at 8-15, 19, 23-25; Govt. Ex. 1). Winship's interaction with Defendant ended when he transferred custody of Defendant to another Trooper, Jim King. (*Id.* at 10, 15). Trooper King subsequently transferred custody of Defendant to DEA Task Force Officer (TFO) Eugenio Zuniga. (*Id.* at 30-31). Trooper King also wore a body camera, and the footage captured by his body camera, which includes the entire transfer of custody to Zuniga, was also admitted into evidence. (*Id.* at 20-21, 30-31; Govt. Ex. 2).

Zuniga testified that he is a native Spanish speaker, and he is fluent in Spanish. (*Id.* at 27-28, 56). Zuniga had been involved in the prior investigation and surveillance of Defendant, and his role on July 29th included assisting with translating as needed at the property site, taking Defendant into custody, and arranging for Defendant's transport to the U.S. Marshal's office in Portland, Oregon. (*Id.* at 29). Zuniga testified that, having been involved in the investigation, he knew what Defendant looked like, and that during the course of the investigation, when Zuniga heard Defendant speak, Defendant always spoke Spanish. (*Id.* at 29-30).

4

Zuniga testified that when he first encountered Defendant on July 29th, just prior to 5:00 a.m., Defendant appeared to have just woken up, and his hair was disheveled, but Defendant did not appear to be injured in any way. (*Id.* at 31-32, 51-52, 59). During Zuniga's interaction with Defendant, DEA Special Agent (SA) Samuel Landis was also present. (*Id.* at 32). Zuniga testified that they conducted a brief cursory pat down of Defendant to check for weapons, and then he and Landis transported Defendant to the Salem Police Department, which was about 15-20 minutes away, in Zuniga's Ford F-150 unmarked pick-up truck. (*Id.* at 32-34). During the transport, Zuniga drove, Defendant sat in the front passenger seat, and Landis sat behind Defendant in the back passenger seat. (*Id.* at 33-34). Zuniga testified that he did not specifically recall speaking to Defendant during the drive, but that based on his normal practice, he likely gave Defendant a brief summary of what was going to happen. (*Id.* at 34). Zuniga testified that he did not ask Defendant any questions related to the investigation during the car ride. (*Id.*).

When they arrived at the Salem Police Department, Zuniga parked in the "sallyport,"[3] and using the elevator, he and Landis escorted Defendant upstairs to the holding cell area, which was a small area with only four cells and a desk sitting in the middle. (*Id.* at 33, 35, 43, 64). At that time, prior to placing Defendant in a holding cell, Landis did a second pat down of Defendant, and he located a small package of suspected cocaine in Defendant's front pants pocket.

---

[3] A sallyport is "a secure entryway (as at a prison) that consists of a series of doors or gates." *See https://www.merriam-webster.com/dictionary/sally%20port.*

(*Id.* at 33, 35, 46, 61-65, 69-70, 76-77). Defendant's handcuffs were then removed, and he was placed in a holding cell with the cell door left open. (*Id.* at 35, 40-41, 47). Zuniga testified that his handgun was either at his waistband or concealed, and also that he could not recall if Landis had a weapon, but if he did, it was not drawn or shown to Defendant. (*Id.* at 41-42, 68). At that point, while Defendant was sitting in the holding cell, which according to Zuniga was about 5:30 a.m., Zuniga read the *Miranda* warnings to Defendant in Spanish, verbatim, from the plastic card issued to Zuniga by DEA. (*Id.* at 35-39, 61-65, 69-70, 72-74, 77; Govt. Ex. 3). One side of the card has the warnings written in English, and the other side of the card has the same warnings written in Spanish. (*Id.* at 37-39; Govt. Ex. 3). Zuniga testified that the warnings on the card written in Spanish are a translation of the English side. (*Id.* at 38-39). In English, the card states:

> The oral warnings to be given to a subject prior to interrogation. Before we ask you any questions you must understand that you have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. Do you understand? And are you willing to answer some questions?

(*Id.* at 39; Govt. Ex. 3 at 1).

Zuniga testified that after he read the warnings to Defendant, he asked Defendant if he understood those rights, and Defendant responded verbally that he understood. (*Id.* at 39-40, 67, 71-72). According to Zuniga, Defendant

then asked "if or when he would be assigned an attorney." (*Id.* at 40). Zuniga told Defendant that he would be transported to the U.S. Marshal's office that morning, he should have a first hearing at 3:00 p.m. that afternoon, and that a defense attorney would be assigned (if Defendant did not already have an attorney) at the hearing or shortly after. (*Id.* at 40). Zuniga then asked if Defendant wished to speak to him, and Defendant responded that he was willing to speak to Zuniga. (*Id.*).

Zuniga testified that the total amount of time he spent with Defendant at the police department was about 30-40 minutes, and that part of that time was spent dealing with Defendant's personal property, including looking up Defendant's wife's phone number in Defendant's phone, at Defendant's request, so that Defendant's wedding ring could be given to his wife. (*Id.* at 45, 48-49, 65, 67-68, 70-71, 76-78; Govt. Ex. 4). According to Zuniga, his actual questioning of Defendant lasted only about 10-15 minutes. (*Id.* at 45). Zuniga testified that they spoke in Spanish during his entire interaction with Defendant, and that Defendant appeared to have no trouble understanding Zuniga, given that Defendant's responses were appropriate, and he never looked confused or asked that questions be repeated. (*Id.* at 43-45, 50, 65-68, 74-75). And indeed, according to Zuniga, when Defendant did not understand Zuniga's use of the term methamphetamine, which is "metanfetamina" in Spanish, Defendant asked about it, and when Zuniga then used the street terms for methamphetamine—"windows, waters or crystals"—Defendant indicated that he understood. (*Id.* at 75). Zuniga testified that the tone of the interview with Defendant was "[n]ormal, calm, polite, respectful," with no raised voices

7

at any time.  (*Id.* at 46). Zuniga further testified that no one was untruthful about anything discussed with Defendant, no one touched Defendant during the interview, or otherwise threatened Defendant in any way, and no promises were made to Defendant. (*Id.* at 46-48). According to Zuniga, the interview ended when Defendant told Zuniga that he did not want to answer any further questions, or incriminate himself any further, and he requested an attorney. (*Id.* at 49, 52-53).

### III.   DISCUSSION

During his encounter with law enforcement on July 29, 2021, Defendant made statements at two different times. The first set of statements was made to Trooper Winship prior to receiving *Miranda* warnings, and the second set of statements was made to TFO Zuniga, after receiving *Miranda* warnings. The Court addresses each in turn.

### A.   Defendant abandoned any challenge to his first set of statements.

In his post-hearing briefs, Defendant addresses only the statements he made to Zuniga, arguing that they were made in violation of *Miranda*, and he does not address the first set of statements he made to Trooper Winship. (Docs. 62 at 5-13; 64 at 1-9). Thus, Defendant has abandoned any challenge to his first set of statements. *See United States v. Nuckles*, No. 1:14-CR-218-ODE-AJB, 2015 WL 1600687, at *7 (N.D. Ga. Apr. 7, 2015), aff'd, 649 F. App'x 834 (11th Cir. 2016)(adopting Magistrate Judge's finding that Defendant abandoned his argument relating to the voluntariness of his statements because he failed to brief the issue)(citing *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n. 2 (11th

8

Cir. 2005)(noting that when a party fails to offer argument on an issue, that issue is abandoned)); *United States v. Baza*, No. 4:06-CR-086-04-HLM, 2008 WL 11383329, at *19 (N.D. Ga. Feb. 21, 2008), aff'd, 383 F. App'x 858 (11th Cir. 2010)(agreeing with Magistrate Judge's finding that Defendants abandoned their motions to suppress statements because they did not argue the issues raised in those motions in their post-hearing briefs); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1331 n. 8 (N.D. Ga. 2009)(noting that because Defendant did not brief the standing issue, it was abandoned); *see also United States v. Everett,* No. 1:17-CR-020-RWS-JKL, 2018 WL 2189763, at *13 (N.D. Ga. Mar. 30, 2018), report and recommendation adopted, No. 1:17-CR-20-RWS-JKL, 2018 WL 2187407 (N.D. Ga. May 10, 2018)(finding that because Defendant made no argument in his post-hearing brief that his statements were involuntary or in violation of *Miranda*, his motion was abandoned, and the Court may deny it on that basis); *United States v. Conard*, No. 1:00-CR-859-RWS-ECS, 2011 WL 5191789, at *1 (N.D. Ga. Oct. 5, 2011), report and recommendation adopted, No. 1:11-CR-00099-RWS, 2011 WL 5331720 (N.D. Ga. Nov. 4, 2011)(finding that Defendant abandoned, by failing to address or argue, any claim to suppression of the evidence obtained by law enforcement).

Notwithstanding Defendant's abandonment of any challenge to his first set of statements, the Court notes that Trooper Winship's questions asking for Defendant's name and photo identification are "routine booking question[s]" that fall outside the protections of *Miranda*; thus, Defendant's statements answering those questions are admissible. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)(holding that questions asking for defendant's name, address,

9

height, weight, eye color, date of birth, and current age fall within a "routine booking question" exception which "exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services")(internal quotations omitted). Also, as to Defendant's statement identifying himself in the surveillance photo, the government stated in its response that it would not seek to introduce that statement in its case-in-chief, though the statement would be admissible to impeach any contradictory trial testimony by Defendant. (Doc. 63 at 18). The Court agrees with the government that the evidence establishes that the statement is trustworthy. (*Id.*); *see Harris v. New York*, 401 U.S. 222, 224-226 (1971)(holding that a statement obtained in violation of *Miranda* is admissible to impeach defendant's trial testimony, provided the statement is otherwise trustworthy, and explaining that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances"); *see also Oregon v. Hass*, 420 U.S. 714, 722–23 (1975)(finding that defendant's statements in violation of *Miranda* were sufficiently trustworthy and admissible for impeachment because the evidence showed that although the defendant properly sensed he was in trouble, the pressure on him was no greater than that on any person in like custody or under inquiry).

Accordingly, as to Defendant's first set of statements, the Court **RECOMMENDS** that Defendant's motion to suppress statements be **DENIED**.

**B.    Defendant's *Miranda* waiver was knowing and voluntary; thus, Defendant's second set of statements should be ruled admissible.**

Before the government may introduce a defendant's uncounseled, custodial statement(s),[4] it must show that the defendant made a voluntary, knowing and intelligent waiver of his right to counsel, and his privilege against self-incrimination. *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991)(citing *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)). In general, establishing the voluntariness of a *Miranda* waiver requires a two-part showing. First, the government must show that the waiver was the product of a free and deliberate choice rather than a result of intimidation, coercion, or deception; and second, that the waiver was made with the awareness of both the right being abandoned and the consequences of the decision to abandon the right. *Beale*, 921 F.2d at 1434-35. "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). A defendant may knowingly and intelligently waive *Miranda* rights despite a lack of education, an inability to speak English, or a mental disability. *Id.*; *Beale*, 921 F.2d at 1435; *United States v. Boon San Chong*, 829 F.2d 1572, 1574-75 (11th Cir. 1987)(holding that defendant's *Miranda* waiver was valid because defendant was advised of his *Miranda* rights in both English and Chinese, he indicated that

---

[4] Here, the government does not dispute that Defendant was "in custody" for both sets of statements. (Doc. 63 at 11 n.6).

11

he understood his rights, and he began answering questions indicating that he was knowingly waiving his rights).

Here, the totality of the circumstances establish that Defendant made a knowing and voluntary waiver. The uncontroverted evidence establishes that TFO Zuniga, a native Spanish speaker, read the *Miranda* warnings to Defendant in Spanish, verbatim, from the plastic card issued to Zuniga by DEA. (Doc. 59 at 35-39, 61-65, 69-70, 72-74, 77; Govt. Ex. 3). Defendant stated to Zuniga that he understood his rights, and Defendant's actions also showed that he understood. (*Id.* at 39-40, 67, 71-72). He asked Zuniga "if or when he would be assigned an attorney," and Zuniga told Defendant that he would be transported to the U.S. Marshal's office that morning, he should have a first hearing at 3:00 p.m. that afternoon, and that a defense attorney would be assigned, if Defendant did not already have an attorney, at the hearing or shortly after. (*Id.* at 40). Defendant then agreed to speak with Zuniga, and notably, after answering some of Zuniga's questions, Defendant told Zuniga that he did not want to answer any further questions, or incriminate himself any further, and he requested an attorney, at which time the interview ended. (*Id.* at 27-28, 49, 52-53, 56). This action by Defendant especially indicates his understanding of his rights and his knowing waiver. "[T]he accused's selective responses suggest an understanding of the right not to respond"; thus, Defendant's "decision to answer some questions, but not others," supports finding that he made a knowing waiver. *Boon San Chong*, 829 F.2d at 1574. Further, according to Zuniga, they spoke in Spanish during his entire interaction with Defendant, and Defendant appeared to have no trouble understanding Zuniga, given that Defendant's responses

were appropriate, and he never looked confused or asked that questions be repeated. (*Id.* at 43-45, 50, 65-68, 74-75). And indeed, Zuniga testified that when Defendant did not understand Zuniga's use of the term methamphetamine, which is "metanfetamina" in Spanish, Defendant asked about it, and when Zuniga then used the street terms for methamphetamine—"windows, waters or crystals"—Defendant indicated that he understood. (*Id.* at 75). Although a language barrier may impair an individual's ability to knowingly waive his rights in some instances, there is no evidence here that Zuniga and Defendant had any language barrier or difficulty communicating in Spanish, and as discussed above, Defendant's actions showed his understanding. *See Boon San Chong*, 829 F.2d at 1574 (affirming denial of suppression because defendant was advised of his rights in both his native language and English, he claimed to understand those rights, and he thereafter elected to answer questions); *see also United States v. Kalu*, 485 F. App'x 366, 369 (11th Cir. 2012)(holding that when law enforcement provides uncontroverted testimony of a fact, the evidence is sufficient to show that fact).

The uncontroverted evidence also establishes that there was no show of force, no deception, no threats, and no promises of any benefit when Defendant waived his rights and agreed to speak to Zuniga. Prior to reading the *Miranda* warnings to Defendant, Defendant's handcuffs were removed, and he was placed in a holding cell with the cell door left open. (Doc. 59 at 35, 40-41, 47). Zuniga testified that his handgun was either at his waistband or concealed, and also that he could not recall if SA Landis had a weapon, but that if he did, it was not drawn or shown to Defendant. (*Id.* at 41-42, 68). Zuniga further testified that

13

the tone of the interview with Defendant was "[n]ormal, calm, polite, respectful," with no raised voices at any time, no one was untruthful about anything discussed with Defendant, no one touched Defendant during the interview, or otherwise threatened Defendant in any way, and no promises were made to Defendant. (*Id.* at 46-48).

   In light of these circumstances, the Court finds that Defendant's *Miranda* waiver was knowing and voluntary. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *Davis v. United States*, 512 U.S. 452, 460 (1994). "[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." *Id.* Indeed, according to the Supreme Court, "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility" of a resulting statement. *Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004). "[M]aintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." *Seibert*, 542 U.S. at 609. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433, n.20 (1984). The Supreme Court's admonition holds equally true here. Accordingly, because the uncontroverted evidence establishes that Zuniga "adhered to the dictates of *Miranda*," Defendant's second set of statements should be ruled admissible.

14

Defendant argues that Zuniga should have provided a written waiver for Defendant to sign to show the "voluntariness" and "comprehension" of his waiver, (Doc. 64 at 7-9), but the law does not require it. Failure to obtain a signed *Miranda* waiver is not proof that a defendant did not freely and intelligently waive his rights. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010); *United States v. Patman*, 557 F.2d 1181, 1182 (5th Cir. 1977)[5](finding defendant's confession admissible despite his refusal to sign a waiver because the "defendant stated that he was willing to answer questions and that he understood his rights," and there was no "contrary evidence" to show the confession was involuntary); *Boon San Chong*, 829 F.2d at 1574 (explaining that a waiver of rights can be implied from the actions and words of the person being questioned, and that "Courts have for some time rejected the argument that a refusal to sign a waiver form automatically renders subsequent questioning improper"). "[T]he *Miranda* waiver form is but one of the pieces of evidence the court considers in determining whether the Government has proved by a preponderance of the evidence that the defendant voluntarily waived his rights." *Bernal-Benitez*, 594 F.3d at 1319 (affirming denial of defendant's motion to suppress based on district court's finding that agents' unrebutted testimony that defendant orally waived his *Miranda* rights was credible).

---

[5] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit that were issued before October 1, 1981.

15

Defendant also argues that Zuniga's testimony at the evidentiary hearing was inconsistent with his written report of Defendant's interview in two ways: (1) the report does not mention that SA Landis searched Defendant when they arrived at the police department, at which point, according to Zuniga's testimony, the suspected cocaine in Defendant's pants pocket was located; and (2) the report "reads as though cocaine was found after [Defendant] received his *Miranda* warnings" instead of before the *Miranda* warnings, as Zuniga testified. (Docs. 62 at 12-13; 64 at 2-5; Govt. Ex. 4; *see also* Doc. 59 at 33, 35, 46, 61-65, 69-70, 76-77). Defendant does not explain how these two alleged inconsistencies between Zuniga's written interview report and his testimony are relevant to the determination the Court must make here about whether Defendant's *Miranda* waiver was knowing and voluntary. (Docs. 62; 64). Presumably, though Defendant does not expressly say so in his briefs, Defendant is arguing that these two inconsistencies show that Zuniga's overall testimony is not credible. The Court disagrees.

First, having personally observed Zuniga at the evidentiary hearing, the Court finds that Zuniga's testimony, given under oath, was credible. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002)(credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony, and the "choice of whom to believe is conclusive on the [reviewing] court unless the judge credits *exceedingly* improbable testimony")(emphasis in original)). Second, nothing in Zuniga's written interview report actually contradicts any of the testimony he gave under oath. (Govt. Ex. 4; Doc. 59 at 26-78). Third, the Court finds that Zuniga's

16

written interview report is materially consistent with his testimony. At the hearing, Zuniga was asked multiple times by both government counsel and defense counsel whether the second pat down of Defendant by Landis at the police department occurred before or after Zuniga gave the *Miranda* warnings, and Zuniga's testimony about the timing never changed—he testified every time that the *Miranda* warnings were given after the pat down by Landis, which occurred when they first arrived at the police department, and that all questions to Defendant about the investigation and the suspected cocaine found in his pants occurred after the warnings had been given. (Doc. 59 at 33, 35-39, 46, 61-65, 69-70, 72-74, 76-77). Defendant is correct that the written interview report does not mention the second pat down by SA Landis when they arrived at the police department. (Govt. Ex. 4). The report states only that "A small amount of drugs were located in SOLORIO's pants pocket," without stating when that occurred, or who located it. (Govt. Ex. 4 at ¶5). But the additional seizure and arrest reports written by Zuniga that were provided by both Defendant and the government as attachments to their post-hearing briefs provide the information Defendant argues is missing from Zuniga's interview report—namely, the July 30, 2021, seizure and arrest report states that upon arrival at the police department, Landis checked Defendant for weapons prior to placing him in a holding cell, and he located a user amount of a white, powdery substance in a "baggy" in Defendant's right front pants pocket. (Docs. 63-1 at 1; 64-2 at 1). This statement in the seizure report is entirely consistent with Zuniga's hearing testimony that when they arrived at the police department, he and Landis escorted Defendant upstairs to the holding cell area, and prior to placing

17

Defendant in a holding cell, Landis did a second pat down of Defendant, at which point he located a small package of suspected cocaine in Defendant's front pants pocket. (Doc. 59 at 33, 35, 43, 46, 61-65, 69-70, 76-77).

As for Defendant's assertion that the interview report "reads as though cocaine was found after [Defendant] received his *Miranda* warnings" instead of before the *Miranda* warnings, as Zuniga testified, (Docs. 62 at 12-13; 64 at 2-5), it is true that the paragraph in the report stating that drugs were located in Defendant's pants, (Govt. Ex. 4 at ¶5), comes after the paragraph in the report stating that Zuniga gave Defendant *Miranda* warnings. (Govt. Ex. 4 at ¶2). But as discussed, Zuniga's sworn testimony about the timing of the events on July 29th, never wavered. (Doc. 59 at 33, 35-39, 46, 61-65, 69-70, 72-74, 76-77). The fact that the interview report was not written in exact chronological order of events, as well as the fact that it may not include every step-by-step action that agents took on that day, does not persuade the Court that Zuniga's overall testimony at the hearing should be discredited. Substantively, Zuniga's reports, taken together, are consistent with his testimony at the hearing. (Doc. 59 at 26-78; 64-1; 64-2; 64-3; Govt. Ex. 4); *see United States v. Price*, No. 1:07-CR-290-JEC-RGV, 2008 WL 842418, at *2 (N.D. Ga. Mar. 28, 2008), aff'd, 353 F. App'x 308 (11th Cir. 2009)(concluding that state testimony and investigative report were not materially inconsistent with "officer's very clear testimony before the magistrate judge: testimony that the magistrate judge considered and credited").

Accordingly, as to Defendant's second set of statements, the Court **RECOMMENDS** that Defendant's motion to suppress statements be **DENIED**.

18

## IV.    CONCLUSION

For the above reasons, the Court **RECOMMENDS** that Defendant's motion to suppress statements, (Doc. 41), be **DENIED**.

There are no pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**SO RECOMMENDED** this 16th day of March, 2023.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE

19